**2024 WI 42**

# Supreme Court of Wisconsin



OFFICE OF LAWYER REGULATION,

*Complainant,*

*v.*

THOMAS R. NAPIERALA,

*Respondent.*

No. 2023AP2278-D

Decided December 3, 2024

ATTORNEY DISCIPLINARY PROCEEDING.

¶1      PER CURIAM.  We review Referee L. Michael Tobin's report recommending that we adopt a stipulation filed by the Office of Lawyer Regulation (OLR) and Attorney Thomas R. Napierala and publicly reprimand Attorney Napierala for four counts of misconduct.

¶2      Upon careful consideration of the matter, we adopt the stipulation and the referee's findings of fact and conclusions of law and agree that Attorney Napierala's professional misconduct warrants a public reprimand. As is our custom, we also find it appropriate to assess the full costs of the proceeding, which are $2,567.80, against Attorney Napierala.

¶3      Attorney Napierala was admitted to practice law in Wisconsin in 1990. He was previously publicly reprimanded for conduct involving two counts of charging an unreasonable fee, in violation of Supreme Court Rule (SCR) 20:1.5(a), and one count of failing to communicate to a client the basis or rate of the fee and expenses for which the client will be responsible, in violation of SCR 20:1.5(b)(1). *See In re*

*Disciplinary Proceedings Against Napierala*, 2018 WI 101, 384 Wis. 2d 273, 918 N.W.2d 893.

¶4    On December 6, 2023, OLR filed a complaint alleging that Attorney Napierala committed four counts of misconduct. The first two counts arose out of Attorney Napierala's representation of D.M. Attorney Walter Stern had filed a complaint on behalf of D.M. in U.S. District Court for the Eastern District of Wisconsin alleging employment discrimination against D.M.'s former employer. At the time, Attorney Napierala was sharing office space in Milwaukee with Attorney Paul A. Strouse's firm, Strouse Law Offices. In addition to sharing office space, Napierala's and Strouse's firms also shared office equipment and timekeeping and scheduling software.

¶5    In approximately May 2019, Attorney Stern began speaking with Attorneys Napierala and Strouse about referring clients, including D.M., to them in anticipation of Attorney Stern's planned retirement. On May 9, 2019, Attorney Stern sent a letter of understanding to Attorneys Napierala and Strouse as successor counsel outlining their agreement as to the responsibilities for the handling of the referred cases and the division of fees between Attorney Stern and the successor attorneys. Between June 20, 2019 and approximately December 10, 2019, Attorney Stern was the only attorney of record for D.M. in the lawsuit.

¶6    On September 24, 2019, the district court entered a scheduling order requiring the parties to file initial disclosures by November 15, 2019, and requiring D.M. to file his expert witness disclosure by January 3, 2020. The deadline for discovery was set for April 15, 2020, and the deadline for dispositive motions was set for June 1, 2020. The scheduling order and information about the deadlines contained in the order was made available on PACER that same date.

¶7    On October 1, 2019, D.M.'s former employer's counsel served a first set of interrogatories and request for production on Attorney Stern. D.M.'s response was due by October 31, 2019. On October 9, 2019, one of Attorney Stern's nonlawyer staff provided a list of client names to Attorneys Strouse and Napierala which identified matters that were being transferred to Attorneys Strouse and Napierala for handling. The list included D.M.'s case.

¶8    On November 18, 2019, Attorney Stern filed D.M.'s responses to the discovery request. The responses were several weeks overdue,

incomplete, and required supplementation. On November 19, 2019, Attorney Stern filed D.M.'s initial disclosure, which failed to provide a description of D.M.'s damages, a computation of each category of claimed damages, and copies of documentation supporting his damages, as required by Fed. R. Civ. P. 26(a). Attorney Stern disclosed one potential expert witness in the initial disclosure.

¶9 On December 10, 2019, opposing counsel sent Attorney Stern a letter detailing the deficiencies in D.M.'s discovery responses. In addition, the letter stated that the discovery responses failed to provide complete information about D.M.'s witnesses and his attempts to find other employment, and that D.M. failed to provide signed healthcare authorization forms.

¶10 On December 10, 2019, a staff member at Attorney Stern's firm sent D.M. an email confirming that D.M.'s file had been forwarded to Attorneys Napierala and Strouse, who would be performing the day-to-day work on his file. Attorney Stern's nonlawyer staff emailed healthcare authorization forms to D.M. so that D.M.'s former employer could obtain D.M.'s medical and psychotherapy records.

¶11 On December 10, 2019, Attorney Napierala sent D.M. an email, with copies to Attorneys Strouse and Stern and Attorney Stern's nonlawyer staff, raising options for how D.M. could sign the healthcare authorization forms and return them to Attorney Napierala's office.

¶12 Attorney Stern did not file a motion to withdraw or a motion for substitution in D.M.'s case at that time. Attorneys Napierala and Strouse did not file a motion for substitution or notices of appearance in the case at that time.

¶13 On December 19, 2019, Attorney Stern sent an email to opposing counsel in which he said that Attorneys Napierala and Strouse had taken D.M.'s file and that Attorney Napierala would be filing a notice of appearance in the case. Attorney Stern sent a copy of that email to Attorney Napierala.

¶14 On December 19, 2019, Attorney Napierala sent an email to opposing counsel, with a copy to Attorney Strouse, saying that Attorneys Napierala and Strouse would be handling D.M.'s case going forward. Attorney Napierala said that Attorney Stern had informed him of "some issues concerning the initial disclosures." Attorney Napierala also said he

was open to discussing those issues and "will attempt to approach this matter in a diligent way."

¶15    In December 2019, opposing counsel continued to correspond directly with Attorneys Napierala and Strouse regarding their efforts to supplement the initial disclosures and D.M.'s discovery responses. On December 20, 2019, opposing counsel sent an email response to Attorney Napierala, with a copy to Attorney Strouse, acknowledging that the initial disclosures and D.M.'s discovery responses were deficient in multiple respects and that he would appreciate the opportunity to review those with Attorney Napierala.

¶16    On December 26, 2019, Attorney Stern sent an email to Attorney Napierala informing him that D.M. had seen a provider who performed a psychological assessment.

¶17    On December 27, 2019, Attorney Napierala sent an email to opposing counsel, with a copy to Attorney Strouse, saying that Attorney Napierala had met with D.M. in person and was trying to gather the requested information.

¶18    On December 30, 2019, opposing counsel sent an email to Attorney Napierala, with a copy to Attorney Strouse, requesting that they supplement D.M.'s discovery responses. On December 31, 2019, Attorney Napierala sent an email to opposing counsel saying they were actively working on supplementing the deficient discovery responses and suggesting a follow-up on January 10, 2020.

¶19    Attorney Napierala failed to file the expert disclosure on or before the January 3, 2020 deadline, and he failed to file a motion to extend the deadline.

¶20    On January 17, 2020, Attorney Napierala sent an email to opposing counsel saying that he believed they had the signed healthcare authorization forms from D.M. and would send them that day. On January 22, 2020, opposing counsel emailed Attorneys Napierala and Strouse saying that he had not received the supplemental discovery requests or signed authorizations.

¶21    On January 27, 2020, opposing counsel filed a motion to compel discovery responses. On February 10, 2020, Attorneys Strouse and Napierala filed a notice of appearance in D.M.'s lawsuit. Although they did

not file a motion for substitution, the district court withdrew Attorney Stern as counsel of record. After that substitution, Attorneys Strouse and Napierala continued to work to supplement D.M's discovery responses and initial disclosure.

¶22    On February 12, 2020, the district judge held a hearing on the motion to compel and ordered D.M. to turn over all outstanding discovery by March 12, 2020. The judge also decided to hold the matter open until March 12, 2020, for counsel to confer regarding reasonable costs/fees for the motion to compel and for the parties to either file a stipulation or for opposing counsel to submit a specific request for costs/fees.

¶23    On February 14, 2020, Attorney Napierala sent D.M. an email saying he had attended the motion to compel hearing and that "[T]he Judge ordered full disclosure or else the case will likely be dismissed." Attorney Napierala also said that he thought the judge would award attorney's fees in an amount to be determined.

¶24    On February 20, 2020, opposing counsel sent an email to Attorneys Napierala and Strouse saying that his client would agree to accept $6,000 as attorney's fees related to having to file the motion to compel discovery.

¶25    On March 11, 2020, at 1:24 p.m., opposing counsel sent an email to Attorney Napierala saying that D.M.'s expert disclosure deadline had passed on January 3, 2020, and that his client objected to any attempt to introduce expert testimony or opinions in the case. At 5:28 p.m., Attorney Napierala sent an email to Attorney Strouse with "scheduling order on [D.M.]" in the subject line. The email said, "I printed it out.  Indeed we are past the deadline for expert disclosure." Attorney Napierala also said he thought they could request relief from the court because "Walter retired and the deadline passed (thankfully) before we got involved."

¶26    Attorneys Napierala and Strouse did not request an extension of time to file D.M.'s expert disclosure and to provide expert reports. At 5:55 p.m. on March 11, 2020, Attorney Strouse emailed D.M.'s supplemental discovery responses to opposing counsel.

¶27    On March 12, 2020, Attorney Napierala sent an email to opposing counsel, with copies to Attorneys Strouse and Stern, saying that the sanctions requested in the motion to compel discovery seemed excessive. He also stated a willingness to "attend court and argue our

perspective and that of [D.M.]" and said he would notify Attorney Stern of the hearing so he had the opportunity to participate.

¶28     On March 12, 2020, opposing counsel filed a petition seeking $4,000 in attorneys' fees relating to the motion to compel discovery responses. Attorneys Napierala, Strouse, and Stern failed to file written objections or a response to the motion for attorneys' fees and failed to request a hearing on the fee petition.

¶29     On March 24, 2020, opposing counsel or his staff emailed health authorization forms to Attorney Napierala for D.M. to sign. The name of the provider was left blank so that D.M. or his counsel could fill in the names of all providers.

¶30     On April 15, 2020, the federal judge extended the discovery deadline to June 15, 2020 and extended the dispositive motion deadline to July 31, 2020.

¶31     On April 16, 2020, the federal court issued an order awarding $4,000 in attorneys' fees on the motion to compel. In the order, the court noted that D.M. did not respond to the petition for attorneys' fees and that the petition was unopposed.

¶32     On April 17, 2020, opposing counsel sent Attorney Napierala another copy of the healthcare authorization forms to be completed for treatment providers that had been identified by D.M.'s former employer. Opposing counsel also requested that D.M. complete authorization forms for those providers and any others with whom he had sought treatment related to his claims in the pending case.

¶33     On May 5, 2020, opposing counsel filed a letter with the court requesting a hearing regarding D.M.'s failure to supplement his initial disclosure. Opposing counsel noted that D.M. had not provided healthcare authorization forms for the multiple additional health providers that had been identified.

¶34     On May 7, 2020, Attorney Napierala's staff faxed the healthcare authorization forms to D.M. for his signature. D.M. signed and dated the forms and faxed them back to Attorney Napierala's office on May 8, 2020.

¶35    On May 11, 2020, Attorney Strouse filed D.M.'s supplemental initial disclosure in which he identified additional experts and disclosed a computation of each category of damages claimed.

¶36    On May 12, 2020, Attorney Napierala sent an email to D.M. with the second supplemental discovery responses. Attorney Napierala asked D.M. to sign the last page of the discovery responses and return it to him as Attorney Napierala intended to file the responses the next day.

¶37    On May 12, 2020, one of Attorney Napierala's nonlawyer staff sent an email to Attorney Napierala indicating that D.M. needed to have his signature page for the discovery responses notarized and asked if Attorney Napierala would do it. Attorney Napierala responded that he would.

¶38    On May 13, 2020, D.M. contacted one of Attorney Napierala's nonlawyer staff and stated that some corrections needed to be made to the "forms." Nonlawyer staff faxed the second supplemental discovery responses to D.M. that day. It is unknown what, if any, corrections were made to the discovery responses.

¶39    On May 13 or 14, 2020, D.M. signed the signature page for the second supplemental discovery responses that had been faxed to him on May 13, 2020. D.M. faxed the entire document back to Attorney Napierala and Strouse's office on May 13 or 14, 2020.

¶40    On May 14, 2020, after receipt of D.M.'s faxed signature page, Attorney Napierala or his nonlawyer staff affixed Attorney Napierala's notary stamp and signature to the notary block on D.M.'s signature page. The notary block stated "Sworn to before me this 12th day of May, 2020." D.M. did not sign the document on May 12, 2020, nor did he sign it in Attorney Napierala's presence. Also on May 14, 2020, nonlawyer staff at Attorney Napierala's office emailed opposing counsel to inform him that the second supplemental discovery responses would be emailed via Dropbox.

¶41    On May 14, 2020, Attorney Napierala filed a letter with the federal court in response to opposing counsel's May 5, 2020 letter. In response to opposing counsel's complaint that healthcare authorization forms for D.M.'s additional healthcare providers had not been received, Attorney Napierala stated that the forms were not sent to him until May 5,

2020. In fact, the forms had been sent to Attorney Napierala on March 24, April 17, and May 5, 2020.

¶42    On May 15, 2020, Attorney Napierala appeared at a telephonic hearing regarding opposing counsel's May 5, 2020 letter to the federal court. During the hearing, Attorney Napierala stated to the court that he and Attorney Strouse had taken on D.M.'s case at a point when the expert witness disclosure deadline had already passed. In fact, Attorneys Napierala and Strouse had taken over D.M.'s case prior to the deadline to disclose expert witnesses. During the hearing, opposing counsel asked for a notarized signature page for D.M.'s second supplemental discovery responses. Following the hearing, Attorney Napierala emailed D.M.'s signed and notarized signature page for the second supplemental discovery responses to opposing counsel.

¶43    On May 26, 2020, at 9:51 a.m., Attorney Napierala sent an email to D.M. and Attorney Strouse saying that the "deadline for filing expert reports is long past" and that they "cannot file them."

¶44    On May 26, 2020, Attorney Stern sent two emails to Attorney Napierala, one at 12:11 p.m. and one at 12:52 p.m, in which he stated that he had just talked to D.M. and that Attorney Stern thought a motion could be filed to permit disclosing expert witnesses and that he could not see why a judge would not permit it.

¶45    On June 15, 2020, the federal court extended the discovery deadline to August 14, 2020 and extended the dispositive motion deadline to September 29, 2020. On August 6, 2020, the court extended the discovery deadline to September 13, 2020 and extended the dispositive motion deadline to October 29, 2020.

¶46    On September 11, 2020, counsel for D.M.'s former employer filed Defendant's Notice of Motion and Motion for Summary Judgment. The grounds for the motion were that D.M. did not have prima facie evidence to support his claims of discrimination or retaliation. On the same date, opposing counsel filed a motion for sanctions based on D.M.'s repeated failures to disclose discovery related to his medical treatment.

¶47    Attorneys Napierala and Strouse failed to file a response to either the motion for summary judgment or the motion for sanctions.

¶48    In October 2020, Attorneys Strouse and Napierala severed their office sharing arrangement.

¶49    On April 15, 2021, Attorney Napierala filed a motion to withdraw from representing D.M. In his motion, Attorney Napierala stated that, "A copy of this motion has been provided to the Plaintiff [D.M.] and all counsels." In fact, Attorney Napierala had not provided a copy of the motion to D.M. and had not informed D.M. that he intended to file the motion to withdraw.

¶50    On April 15, 2021, the federal court granted Attorney Napierala's motion to withdraw.

¶51    On April 16, 2021, Attorney Napierala instructed nonlawyer staff to notify D.M. that Attorney Napierala had filed the motion to withdraw. The staff sent a copy of the motion to D.M. by email.

¶52    On June 9, 2021, the federal court granted the motion for summary judgment and ordered that the case be dismissed. The court found that D.M.'s counsel failed to file a response to the moving party's statement of facts or otherwise respond to the motion for summary judgment. The federal court also granted the motion for sanctions and ordered Attorneys Napierala and Strouse to pay the $4,000 in sanctions the court had ordered in April 2020.

¶53    The OLR's complaint alleged the following counts of misconduct with respect to Attorney Napierala's representation of D.M.:

> COUNT ONE:    By failing to file D.M.'s expert witness disclosures or a motion to extend the time to file the expert witness disclosures; by failing to file a response to the March 12, 2020 fee petition; by failing to file a response to the September 11, 2020 motion for summary judgment; and/or by failing to file a response to the September 11, 2020 motion for sanctions, Attorney Napierala, in each instance, violated SCR 20:1.3.[1]

> COUNT TWO:    by misrepresenting to the federal court in a May 14, 2020 letter that opposing counsel did not provide

---

[1] SCR 20:1.3 provides: A lawyer shall act with reasonable diligence and promptness in representing a client.

healthcare authorizations to Attorney Napierala until May 5, 2020 when in fact the authorizations had been sent to Attorney Napierala on March 24 and April 17, 2020; by misrepresenting to the federal court in a May 15, 2020 hearing that he and Attorney Strouse did not take on D.M.'s case until after the January 3, 2020 expert witness disclosure deadline; and/or by misrepresenting to the court that Attorney Napierala had provided D.M. with a copy of his motion to withdraw when in fact he had not yet done so, Attorney Napierala, in each instance, violated SCR 20:3.3(a)(1).[2]

¶54   The remaining two counts of misconduct alleged in OLR's complaint arose out of Attorney Napierala's handling of a foreclosure action. On April 6, 2017, J.M. and M.M. retained Attorney Napierala to represent them in a foreclosure action related to their home that had been filed against them by mortgagee Ally Bank. Ally Bank sought judgment on the mortgage note and mortgage. Central Loan Administration & Reporting ISAOA ATIMA (CENLAR) was responsible for servicing the mortgage loan to the Ms and held by Ally Bank.

¶55   The mortgage required the Ms to promptly notify Ally Bank and/or CENLAR in the event of a loss related to the home; required the Ms, unless otherwise agreed to in writing, to use any insurance proceeds for the purpose of repairing the home or to purchase a replacement home; and granted Ally Bank and/or CENLAR the right to hold and manage any insurance proceeds intended to repair the home until Ally Bank and/or CENLAR had the opportunity to inspect the property to make sure the repair work was undertaken. If Ally Bank determined that repair of the property was not economically feasible, or if it would lessen Ally Bank's security interest in the property, Ally Bank was entitled to apply the insurance proceeds to pay its outstanding security interest in the property before paying the excess proceeds, if any, to the Ms and their daughter, T. M.-F.

---

[2] SCR 20:3.3(a)(1) provides:

(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]

¶56 On November 6, 2017, the judge in the foreclosure action issued an Order and Judgment of Foreclosure which provided that $189,475.91 was due to Ally Bank under the terms of the note and mortgage. The order provided for a six-month redemption period.

¶57 On November 19, 2017, the Ms home was damaged by a fire. The fire occurred during Attorney Napierala's representation of the Ms during the redemption period.

¶58 The Ms home was insured by a policy issued by State Farm Fire & Casualty Company. The State Farm policy was in effect for the policy term of April 16, 2017 to April 16, 2018. The policy declarations page listed as insureds The Ms, T. M-F., and CENLAR. The State Farm policy contained a standard mortgage clause requiring that CENLAR be a co-payee on any payments from State Farm for loss or damage to the Ms home.

¶59 The State Farm policy provided that until actual repairs or replacement of the home were completed, State Farm would pay the actual cash value at the time of the loss, and the Ms would be entitled to receive the remaining balance of the estimated cost of repairs only after repairs were completed and only if repairs were completed or a replacement property purchased within two years.

¶60 On November 19, 2017, the Ms filed a claim with State Farm for the fire damage to their home. On November 19, 2017, J.M. entered into a contract with Accent Fire and Water Restoration to begin repairs on the home.

¶61 On November 22, 2017, State Farm sent the Ms a letter regarding their claim informing them that if a mortgage company currently held a note on the property, the State Farm policy required that the mortgage company's name be included on any payment for the building. The Ms were advised to contact their mortgage company as quickly as possible to determine their requirements for handling payments.

¶62 State Farm estimated that the total costs of repairs was $172,349.07. After calculating the Ms' deductible, the total estimated cost of repairs to which the Ms would potentially be entitled was $169,532.07. Of that amount, in accordance with their insurance policy, State Farm disbursed to the Ms the actual cash value of $108,457.69, which represented the repair proceeds. The Ms would be entitled to receive the balance of the estimated cost of repairs, which was ultimately calculated to be $59,124.08,

but that amount would only be available after the repairs were completed per the terms of the policy.

¶63     State Farm issued two checks to the Ms for the amount of the repair proceeds related to the fire loss. One check was issued on December 14, 2017 and the other on January 12, 2018. Both checks were payable to J.M., T.M.-F., M.M., and CENLAR. The back of both checks stated, "MUST BE ENDORSED BY ALL PAYEES."

¶64     The Ms brought the first check to Attorney Napierala's office. The signatures of one or both of the Ms and T. M-F. appear on the back of that check. Attorney Napierala or his staff affixed Attorney Napierala's firm's deposit stamp on the back of the check.

¶65     Attorney Napierala failed to notice the identities of all required payees on the first check, failed to have the check endorsed by all payees, failed to take reasonable steps to determine the ownership interests in the repair proceeds, and failed to notify Ally Bank and/or CENLAR that he had received the repair proceeds. On January 17, 2018, Attorney Napierala deposited the check in his trust account without obtaining CENLAR's endorsement.

¶66     On January 18, 2018, C.M., daughter of J.M. and M.M., sent an email to Attorney Napierala asking, "How do we get them to take their amount out and give the rest back to my dad for restoration fees? Can my dad just deposit the check into his bank? The Mortgage co is in this check as well." Attorney Napierala understood C.M. to be referring to Ally/CENLAR as "them" in her question. On January 18, 2018, Attorney Napierala responded to the email:

> I will contact the restoration folks. I believe if we reinstate, they are fine with that as long as the property is then repaired. Essentially, the repair people must take 50k less and maybe skip a few things. Just fix the stuff they must to make the place habitable.

¶67     Attorney Napierala's comment that "they are fine with that as long as the property is then repaired" referred to his belief that Ally/CENLAR was fine with using some of the money from the repair proceeds checks to reinstate the mortgage. Attorney Napierala failed to verify that Ally Bank and/or CENLAR would be "fine" with the Ms using some of the repair proceeds to pay their mortgage.

¶68    On January 23, 2018, Attorney Napierala disbursed $50,000 from the repair proceeds in his trust account to counsel for Ally Bank in the foreclosure action to pay the amount necessary to take the Ms' home out of foreclosure and pay the mortgage through mid-February 2018.

¶69    On approximately January 25, 2018, one or both of the Ms brought the second check to Attorney Napierala's office. The signatures of one or both of the Ms and T. M-F. appear on the back of the check. Attorney Napierala or his staff affixed Attorney Napierala's firm's deposit stamp on the back of the check. Attorney Napierala again failed to notice the identities of all required payees on the check, failed to have the check endorsed by all payees, failed to take reasonable steps to determine the ownership interests in the repair proceeds, and failed to notify Ally Bank and/or CENLAR that he had received the repair proceeds. Attorney Napierala deposited the second check in his trust account without obtaining CENLAR's endorsement.

¶70    Between January 3 and 23, 2018, Attorney Napierala discussed a plan with the Ms and C.M. to use approximately $47,000 of the repair proceeds to pay the past due amount on the Ms mortgage to take their home out of foreclosure. Using any of the repair proceeds without Ally Bank's or CENLAR's knowledge, or for purposes other than repairs to their home or purchase of a replacement home, violated the terms of the Ms' mortgage.

¶71    As of February 1, 2018, the Ms' house had an actual cash value of $108,457.69 according to State Farm's estimate. The outstanding principal balance on the mortgage loan, after the $50,000 payment, was $150,754.72.

¶72    Following the January 23, 2018 disbursement of $50,000 to reinstate the mortgage, Attorney Napierala failed to understand the amount of funds which were available, thinking that the remaining $59,124.08 of repair benefits were available even though none of the necessary repairs had been done. As a result, Attorney Napierala provided inaccurate information to others.

¶73    On February 27, 2018, Attorney Napierala advised Accent Fire and Water Restoration to budget $90,000 for the repairs to the Ms' house.  Attorney Napierala said that despite some unavoidable issues that depleted the repair proceeds, there were funds available for the repairs, and he suggested that Accent figure out a way to lower the cost of the repairs.

As of February 27, 2018, Attorney Napierala was holding less than $42,000 of the repair proceeds.

¶74    Between January 23 and May 23, 2018, Attorney Napierala disbursed the remaining repair proceeds being held in his trust account, and as of May 23, he had expended the $108,457.69 he had received from State Farm. As of May 23, 2018, only remediation services had been performed on the home. None of the repairs to make the home habitable were performed.

¶75    In approximately November 2018, the Village of Greendale razed the Ms' home due to its condition and the Ms' failure to repair the home in a timely manner.

¶76    The OLR's complaint alleged the following counts of misconduct with respect to Attorney Napierala's handling of the foreclosure matter:

> COUNT THREE: By failing to review the Ms' home mortgage or homeowners policy; by failing to take reasonable steps to review checks provided to him by his clients to ensure that all required endorsements were obtained prior to depositing the checks; by failing to take reasonable steps to ascertain the ownership interests in funds entrusted to him by his clients; and/or by failing to take reasonable steps to ascertain the amount of insurance proceeds available to repair the Ms' home so that he could advise the Ms and third parties about the funds available to repair the Ms' home, Attorney Napierala, in each instance violated SCR 20:1.3.

> COUNT FOUR: By disbursing any of the repair proceeds before determining the mortgage company's interests in the funds, before notifying the mortgage company of his receipt of the funds, and before resolving their respective interests in the funds, Attorney Napierala violated SCR 20:1.15(e)(1) and (3).[3]

---

[3] SCR 20:1.15(e)(1) and (3) provide:

(e) **Prompt notice and delivery of property.**

¶77    Attorney Napierala filed an answer to the complaint on December 28, 2023.

¶78    On March 18, 2024, OLR and Attorney Napierala entered into a comprehensive stipulation whereby Attorney Napierala stipulated to all of the facts alleged and to the four counts of misconduct set forth in the OLR's complaint. Attorney Napierala agreed that the allegations of the complaint provided an adequate factual basis in the record for a determination of violations of supreme court rules as to the four counts in the complaint. The parties agreed that the appropriate level of discipline for Attorney Napierala's misconduct was a public reprimand.

¶79    Attorney Napierala averred that the stipulation was not the result of plea bargaining but rather was the result of his voluntary decision to not further contest the matter. He represented that he fully understands the allegations to which he stipulated; his right to contest the matter; and the ramifications of his entry into the stipulation. He further stated that he has consulted with counsel and that his entry into the stipulation was made knowingly and voluntarily.

---

(1) **Notice and delivery.**  Upon receiving funds or other property in which a client has an interest, or in which a lawyer has received notice that a 3rd party has an interest identified by a lien, court order, judgment, or contract, the lawyer shall promptly notify the client or 3rd party in writing.  Except as stated in this rule or otherwise permitted by law or by agreement with the client, the lawyer shall promptly deliver to the client 147 or 3rd party any funds or other property that the client or 3rd party is entitled to receive.

. . .

(3) **Disputes regarding trust property**.  When a lawyer and another person or a client and another person claim an ownership interest in trust property identified by a lien, court order, judgment, or contract, the lawyer shall hold that property in trust until there is an accounting and severance of the interests.  If a dispute arises regarding the division of the property, the lawyer shall hold the disputed portion in trust until the dispute is resolved.  Disputes between the lawyer and a client are subject to the provisions of SCR 20:1.5(h).

¶80 On July 1, 2024, the referee issued a report and recommendation accepting the stipulation and adopting all of the factual allegations in OLR's complaint. The referee also adopted the conclusions in the stipulation that Attorney Napierala violated the supreme court rules identified in the complaint.

¶81 As to the appropriate sanction, the referee noted that generally discipline is progressive in nature, but at times this court has imposed a second public reprimand rather than impose a suspension. *See, e.g., In re Disciplinary Proceedings Against Clemment*, 2018 WI 69, ¶26, 382 Wis. 2d 324, 913 N.W.2d 867. The referee concluded that a public reprimand will serve the major purposes of attorney discipline, which are the protection of the public, deterrence of other attorneys, and rehabilitation. The referee said:

> A reprimand protects the public against future harm both by alerting the attorney to the problematic conduct and by providing potential clients with the ability to learn of the disciplinary history.

> A public reprimand also has a deterrent effect by notifying other attorneys of conduct that violates ethical rules and could result in discipline. A public reprimand can adversely affect an attorney's reputation within the legal profession, and a public record of dishonesty is particularly likely to diminish an attorney's credibility. Another deterrent aspect of a public reprimand is that potential clients may learn about it, and as a result, be less likely to retain the attorney.

¶82 The referee said although the parties did not identify any specific rehabilitative goals, the disciplinary process supports rehabilitation by identifying specific problematic conduct, and the process calls attention not only to the importance of following supreme court rules in their entirety but also calls attention to the specific rules implicated by the attorney's conduct.

¶83 We affirm a referee's findings of fact unless they are clearly erroneous, and we review the referee's conclusions of law de novo. *See In re Disciplinary Proceedings Against Inglimo*, 2007 WI 126, ¶5, 305 Wis. 2d 71, 740 N.W.2d 125. We may impose whatever sanction we see fit regardless of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule*, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶84    Upon careful review of the record, we accept the referee's findings of fact and conclusions of law and agree that Attorney Napierala committed the four counts of professional misconduct alleged in the complaint.

¶85    The referee is correct that we generally impose progressive discipline, but as the referee also noted, we have in appropriate cases issued more than one public reprimand. Although no two disciplinary matters are precisely alike, issuing a second public reprimand is somewhat analogous to the discipline imposed in *In re Disciplinary Proceedings Against Kremokoski*, 2006 WI 59, 291 Wis. 2d 1, 715 N.W.2d 594, in which an attorney who had previously been publicly reprimanded received a second public reprimand for four counts of misconduct that included failing to act with reasonable diligence and promptness in representing a client. Similarly, in *Clemment*, an attorney who had already received one public reprimand was again publicly reprimanded for six counts of misconduct that included failing to provide competent representation to a client and failing to act diligently on a client's behalf. On balance, we agree with the referee that a second public reprimand is sufficient to address the misconduct at issue here. Finally, as is our general custom, we find it appropriate to assess the full costs of the proceeding against Attorney Napierala.

¶86    IT IS ORDERED that Thomas R. Napierala is publicly reprimanded.

¶87    IT IS FURTHER ORDERED that within 60 days of the date of this order, Thomas R. Napierala shall pay to the Office of Lawyer Regulation the costs of this proceeding, which are $2,567.80.